SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC
David Joseph D'Aloia
Phoebe S. Sorial
One Gateway Center, 13th Floor
Newark, New Jersey 07102
(973) 622-3333 (telephone)
(973) 622-3349 (fax)
Attorneys for Defendant Sylvester Stallone

LOEB & LOEB LLP
Jonathan Zavin (admitted *pro hac vice*)
345 Park Avenue
New York, New York 10154
(212) 407-4000
(212) 407-4990
Attorneys for Defendant Sylvester Stallone

LAVELY & SINGER, PC
Martin D. Singer
Michael D. Holtz
2049 Century Park East, Suite 2400
Los Angeles, California 90067
Attorneys for Defendant Sylvester Stallone

PRYOR CASHMAN SHERMAN & FLYNN, LLP
Stephen F. Huff
410 Park Avenue
New York, New York 10022
Attorneys for Defendant Sylvester Stallone

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CHARLES WEPNER a/k/a CHUCK WEPNER,

Plaintiff,

v.

SYLVESTER STALLONE,

Defendant.

Civil Action No. 03-6166 (KSH)

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS


Page

Table of Authorities .......... ii

PRELIMINARY STATEMENT .......... 1

STATEMENT OF FACTS .......... 5

The 1975 Ali/Wepner Fight Served as an Inspiration for *Rocky* .......... 5

Stallone Never Used Wepner's Name to Advertise or Promote Any Product .......... 7

ARGUMENT .......... 10

I. WEPNER'S NAME WAS MENTIONED FOR INFORMATIONAL PURPOSES ONLY, NOT FOR "PREDOMINANTLY COMMERCIAL" OR "TRADE" PURPOSES. .......... 10

A. New Jersey Law Requires that the Use of Plaintiff's Name be for "Predominantly Commercial or Trade Purposes" to Violate the Right of Publicity. .......... 10

B. Wepner's Name was Only Mentioned to Inform the Public of the Creative History of *Rocky* and Was Never Used for Commercial Purposes. .......... 12

II. STALLONE IS NOT LIABLE FOR THIRD-PARTY USES OF WEPNER'S NAME .......... 14

III. WEPNER'S CLAIM MUST BE DISMISSED BECAUSE HE HAS NO EVIDENCE OF DAMAGES. .......... 15

IV. WEPNER ADMITS HE KNEW THE FACTS UNDERLYING HIS CLAIM IN 1976 AND, THUS, IS TIME-BARRED FROM MAKING ANY CLAIM OR SEEKING ANY DAMAGES BASED ON THE USE OF HIS NAME PRIOR TO 1997. .......... 18

CONCLUSION .......... 20

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bisbee v. John C. Conover Agency, Inc.*,
186 N.J. Super. 335, 452 A.2d 689 (Sup. Ct. 1982) ....................12, 13

*Botts v. The New York Times Co.*,
No. 03-1582 (MLC), 2003 WL 23162315 (D.N.J. Aug. 29, 2003), *aff'd*, 106 Fed. Appx. 109 (3d Cir. 2004) ....................11

*Carafano v. Metrosplash.com, Inc.*,
207 F. Supp. 2d 1055 (C.D. Cal. 2002), *aff'd*, 339 F.3d 119 (9th Cir. 2003) ....................12

*Casini v. Graustein (In re Casini)*,
307 B.R. 800 (Bankr. D.N.J. 2004) ....................19

*Castro v. NYT Television*,
370 N.J. Super. 282, 851 A.2d 88 (Sup. Ct. App. Div. 2004) ....................10, 11, 12

*Cher v. Forum Int'l, Ltd.*,
692 F.2d 634 (9th Cir. 1982) ....................14

*Estate of Elvis Presley v. Russen*,
513 F. Supp. 1339 (D.N.J. 1981) ....................10, 11, 15

*Guglielmi v. Spelling-Goldberg Productions*,
603 P.2d 454 (Sup. Ct. Cal. 1979) .................... 13-14

*Interfaith Community Org. v. Honeywell Int'l, Inc.*,
263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005) ....................19

*Jarvis v. A&M Records*,
827 F. Supp. 282 (D.N.J. 1993) ....................17

*Joe Dickerson & Assocs., LLC v. Dittmar*,
34 P.3d 995 (Sup. Ct. Colo. 2001) ....................10

*Leverton v. Curtis Pub. Co.*,
192 F.2d 974 (3d Cir. 1951) ....................12

*Norwood Easthill Assoc. v. Norwood Easthill Watch*,
222 N.J. Super. 378, 536 A.2d 1317 (App. Div. 1988) .................... 15-16

*Player v. Motiva Enters. LLC*,
02-3216 (RBK), 2006 WL 166452 (D.N.J. Jan. 20, 2006) ....................15, 17

Page(s)

*Prima v. Darden Restaurants, Inc.*,
78 F. Supp. 2d 337 (D.N.J. 2000) .......... 14

*Rocci v. MacDonald-Cartier*,
323 N.J. Super. 18, 731 A.2d 1205 (Super. Ct. App. Div. 1999), *aff'd*, 165 N.J. 149, 755 A.2d 583 (Sup. Ct. 2000) .......... 17

*Rolax v. Whitman*,
175 F. Supp. 2d 720 (D.N.J. 2001) .......... 18

*Rumbauskas v. Cantor*,
138 N.J. 173, 649 A.2d 853 (Sup. Ct. 1994), *aff'd*, 53 Fed. Appx. 635 (3d Cir. 2002) .......... 18

*Russo Farms, Inc. v. Vineland Bd. of Educ.*,
144 N.J. 84, 675 A.2d 1077 (Sup. Ct. 1996) .......... 19

*Seale v. Gramercy Pictures*,
949 F. Supp. 331 (E.D. Pa. 1996) .......... 13

*Stanley v. General Media Communications, Inc.*,
149 F. Supp. 2d 701 (W.D. Ark. 2001) .......... 14

*Tellado v. Time-Life Books, Inc.,*,
643 F. Supp. 904 (D.N.J. 1986) .......... 10, 11

*Wilson v. Wal-Mart Stores*,
158 N.J. 263, 729 A.2d 1006 (Sup. Ct. 1999) .......... 19

**OTHER**

RESTATEMENT (SECOND) TORTS § 652C, comment d (1977) .......... 11-12

Defendant Sylvester Stallone ("Stallone") respectfully submits this memorandum of law in support of his motion, pursuant to Fed. R. Civ. P. 56, for summary judgment against the sole remaining claim, for violation of the right of publicity, asserted by Plaintiff Charles Wepner a/k/a Chuck Wepner ("Wepner").

## PRELIMINARY STATEMENT

Wepner alleged in his complaint that Stallone used Wepner's name to promote and market the film *Rocky*, and that Wepner's name was used in marketing materials for the film, and for commercial purposes (to enhance the sale of the film). It was because of these allegations (which this Court had to accept as true when Stallone moved to dismiss the complaint), that Wepner avoided dismissal of his complaint and was able to force the parties to go through discovery.[1] However, after this discovery, it is now clear that Wepner cannot support any of his allegations of the promotional or other commercial use of his name that allowed his right of publicity claim to survive the prior dismissal motion. These allegations are simply not true. Not only was Wepner's name never "prominently displayed" by Stallone as Wepner alleged, but in the very few times Wepner's name was used by Stallone, it was always in the middle of historical discussion, never in connection with the promotion or marketing of any product, and certainly never for any commercial purpose. The few incidental mentions of Wepner's name on which plaintiff now bases his claim are clearly and unequivocally for informational purposes and cannot be considered for "predominantly commercial purposes" as required to sustain a right of publicity claim under New Jersey law.

---

1 See this Court's Opinion on the motion to dismiss, dated September 27, 2004 ("Op."). (Declaration of Jonathan Zavin ("Zavin Decl."), ¶ 3, Ex. 2 at pp. 6-7.)

In allowing Wepner's claim to proceed through discovery, this Court stated: "The Court agrees with Wepner's contentions, finding that the complaint does not assert that Stallone is barred from acknowledging publicly that he used plaintiff as an inspiration to write the *Rocky* movies." (Op. at 6.) However, after discovery it is clear that Wepner's claim is based solely on Stallone's acknowledgement that he was inspired by a public event in which Wepner was a participant. Wepner has identified only four "uses" of his name as the bases for his claim:

(1) in an interview with Stallone that was included as bonus materials in MGM's 2001 "Special Edition *Rocky* DVD" (which could only be viewed after one had already purchased the DVD), and a one sentence mention in an informational booklet located *inside* the sealed DVD case (also such that no one could even see the name until *after* they purchased the DVD);

(2) mentioned once in the biographical section of Stallone's official website, in a paragraph buried 22 "clicks" or web pages into the site;

(3) on the websites of third-party resellers of the *Rocky* DVD (of which Stallone had no knowledge, involvement, or control); and

(4) in a thirty-minute ESPN sports news program called "Outside the Lines" that, in addition to featuring an interview with Wepner, showed clips from Stallone's interview on the DVD.

(Wepner's Second Supplemental Interrogatory Response No. 3, annexed as Ex. 3 to Zavin Decl., ¶ 4.) Each of these "uses" is simply the repetition of the same, single factual and historical

statement made in the 1970s that Wepner's championship fight with Muhammad Ali was an inspiration for the original *Rocky* film.[2]

If Wepner's claim is allowed to stand here, no one would ever be able to discuss publicly, either in the media, on their websites, or in creative works themselves, the names of any person who may have influenced or inspired their art. The right of publicity cannot be used to stifle such First Amendment-protected speech, nor can it be used by public figures, such as Wepner, to exact monetary reward for the mention of their name in public discourse. Summary judgment is now appropriate.

Stallone is also entitled to summary judgment on three additional independent grounds.

First, except for the mention of Wepner's name in Stallone's website, all of the identified uses were made by third parties (*e.g.*, MGM Home Entertainment, ESPN or buy.com), not Stallone. Stallone cannot be held liable for "uses" of Wepner's name that he did not publish, distribute or have any control over.

Second, Wepner has no evidence of damages (*i.e.*, an "identifiable economic loss"), which is required to sustain a right of publicity claim. Not only has he not suffered any damages, but, as Wepner himself has repeatedly admitted, it was he who capitalized on and greatly benefited from Stallone's crediting of the Ali/Wepner fight as being an inspiration for *Rocky*. In 2002, the year prior to the filing of this action, Wepner stated in the ESPN interview: "I think it's just sour grapes, you know, to say anything about it now. The guy [Stallone] helped me a lot. He did a lot for me; he made me famous. I'm the real-life Rocky, and things have

---

[2] Contrary to Wepner's allegation, *Rocky* is not in any way "based upon" the life of Wepner. (Declaration of Sylvester Stallone ("Stallone Decl."), ¶ 5.)

gone good for me."[3] To this day, Wepner continues to capitalize on his historical association with *Rocky*, and bills himself, for example on his official website, as "Chuck 'The Real Rocky' Wepner." (Wepner Website, annexed as Ex. 9 to Zavin Decl., ¶ 10.)

The only "evidence" of damages proffered by Wepner is the testimony of his purported expert witness, Richard Klubeck ("Klubeck"), a talent agent. In his one page "report" Klubeck proposes to opine (without any factual or analytical support whatsoever) on how "motion pictures based on or inspired by true stories or events generally enjoy an enhanced value at the box office." (Expert Report of Richard Klubeck ("Exp. Rep."), annexed as Ex. 6 to Zavin Decl., ¶ 7.) Such testimony cannot support Wepner's claim because, as set forth in Stallone's accompanying motion to exclude, it is inadmissible as unreliable under Fed. R. Evid. 702. Wepner's "expert" was not asked for and has no opinion on (1) whether Wepner was damaged by the use of his name; or (2) the purported value of the use of Wepner's name in connection with *Rocky*. Even if not excluded, however, the proffered testimony is entirely irrelevant because, as Wepner has repeatedly assured the Court, his claim is not based on the fact that *Rocky* was inspired by the Ali/Wepner fight.

Finally, Wepner's claim is time-barred by the statute of limitations to the extent it relies on any activity occurring more than six years prior to the commencement of this action, *i.e.*, prior to November 1997, and he cannot seek damages for any such activity. Wepner admits

---

[3] This statement is made by Wepner in his interview featured in the 2002 ESPN program "Outside the Lines" -- the very same show that Wepner identifies as supporting his claim. A copy of the ESPN program on DVD is being lodged with the Court on this motion. (Zavin Decl., ¶ 8, Ex. 7.) It is respectfully submitted that the Court view this ESPN program at its earliest opportunity as it exemplifies the absurdity of Wepner's claims. Wepner cannot possibly have a legitimate claim against Stallone for "use" of his name in a TV news show where Wepner himself is featured happily discussing the positive impact his association with *Rocky* has had on his life.

that he was aware, since 1976, of Stallone's public statements that the Ali/Wepner fight was an inspiration for the *Rocky* film. If Wepner had any claim against Stallone for use of his name in connection with the "*Rocky* franchise," as he now alleges, his claim accrued over 25 years ago. The "continuing tort" doctrine cannot resurrect his time-barred claims because the doctrine does not apply to discrete wrongful acts, such as instances of misappropriation of a person's name. Rather, it applies only to tort claims (such as nuisance) that are inherently continuous and cumulative in nature. Moreover, even if it were applicable to resurrect a stale *claim*, the continuous tort doctrine does not allow a plaintiff to recover *damages* incurred outside the six year limitations period immediately preceding the commencement of the action.

## STATEMENT OF FACTS

**The 1975 Ali/Wepner Fight Served as an Inspiration for *Rocky***

The genesis of this case is a 1975 boxing match between Mohammad Ali ("Ali") and Wepner that Stallone saw while developing a script for a boxing movie. (Cmplt., ¶¶ 13, 15; Stallone Decl., ¶ 2.) Wepner was a 30 to 1 underdog who lost the fight, but who lasted fifteen rounds with Ali. (Cmplt., ¶¶ 13-14.) Wepner admits that his performance against the world heavyweight champion was a major worldwide news event at the time, (Deposition Transcript of Charles Wepner ("Wepner Dep. Tr."), annexed as Ex. 4 to Zavin Decl., ¶ 5 at 53:9-54:10), and served as an "inspiration" to many people, not just to Stallone (*id.* at 55:18-24). Shortly after viewing the fight, Stallone completed the initial draft screenplay for *Rocky*. (Stallone Decl., ¶ 4.) *Rocky* is based on a fictional character, "Rocky Balboa," who is an underdog club fighter who ultimately beats the odds and goes the distance against the champion. (2001 *Rocky* DVD, annexed as Ex. 1 to Declaration of Blake Thomas ("Thomas Decl."), ¶ 3.) After numerous

rewrites, *Rocky* was produced and released theatrically in 1976.[4]

In discovery, Wepner produced three news articles confirming that he knew about Stallone's public statement since at least 1977. These articles are: (1) "'Rocky' turns Chuck Wepner into a Winner," Philadelphia Inquirer, dated April 24, 1977 (Zavin Decl., ¶ 11, Ex. 10); (2) "Wepner Sees Stars on his Door," The Bayonne Times, dated February 24, 1978 (*id.* ¶ 12, Ex. 11); and (3) "Bloody Actor!," publication unidentified, date unidentified (*id.* ¶ 13, Ex. 12). He also testified that he learned of the mention of his name in 1976:

> A: Yes. It was in the papers. There was articles in the papers about Stallone writing a script. And people told me that they had heard and read that I was the inspiration for the Rocky movie. And that I had indeed inspired the script for Rocky because of my fight.

(Wepner Dep Tr. at, 10:19-12:8; 12:17-23 (referring to 1976, "he had been interviewed and he said that he had been inspired to write the movie by my fight"); 81:6-15 (Wepner learned five or six months after the 1975 fight that Stallone had written a screenplay about a prize fighter).)

In 1977, Stallone wrote "The Official Rocky Scrapbook" (the "Rocky Scrapbook") in which he relates the story of how he wrote the screenplay for *Rocky*. Stallone describes the impact of the Ali/Wepner fight:

> Through fate or whatever, I ended up at the Muhammad Ali/Chuck Wepner fight. Chuck Wepner, a battling bruising type of club fighter who had never really made the big, big time, was now having his shot. But the fight was not regarded as a serious battle. It was called a public joke. He would barely go three rounds, most of the predictions said. Well, the history books will read that he went fifteen rounds and he established himself as one of the few men who had ever gone the distance with Muhammad Ali and he can hold his head up high forever no matter what happens. I am

---

[4] The film was a box-office success and won three Academy Awards, including for Best Picture. (Stallone Decl., ¶ 6.) Stallone thereafter wrote and starred in and/or directed four additional sequels based on the Rocky Balboa character: *Rocky II*, *Rocky III*, *Rocky IV*, and *Rocky V*. (*Id.* ¶ 1.) Stallone also wrote and will star in a sixth Rocky film titled *Rocky Balboa*, scheduled to be released later this year. (*Id.* ¶ 1.)

> sure that moment meant more to him now than any money he could ever receive from fighting because now he had run the complete circle. This is why he had been training for thirty-four years. That night I went home and I had the beginning of my character.

(Rocky Scrapbook, annexed as Ex. 1 to Stallone Decl., ¶ 7 at p.19.) The Rocky Scrapbook was published starting in 1977. (*Id.* ¶ 7.)

From 1976 and continuing to date, Wepner has enjoyed increased popularity with fans and with the press because of his association with *Rocky*. (Wepner Dep. Tr. at 54:18-21; 74:22-75:9.) He bills himself as the "Real life Rocky," and either directly or through "agents" signed and sold autographs, books, made public appearances and was hired for speaking engagements. (*Id.* at 40:4-21; 39:16; 67:10-21.) He and his wife also own a website at www.wepner.homestead.com, which prominently features Wepner as the "Real Life Rocky," and which mentions *Rocky* or Stallone in connection with his products or services at least 22 times. (Zavin Decl., ¶ 10, Ex. 9.)

**Stallone Never Used Wepner's Name to Advertise or Promote Any Product**

In his response to defendant's interrogatories (Zavin Decl., ¶ 4, Ex. 3), Wepner identifies only four uses of his name in support of his claim:

**1. The Special Edition DVD:** In 2001, MGM Home Entertainment released and distributed a 25th Anniversary Special Edition DVD of *Rocky* (the "DVD"). (Thomas Decl., ¶ 3.) Wepner's name does not appear on the outside packaging of the DVD, or in any advertising or promotional material for the DVD. (*Id.*, Ex. 1.) Wepner's name is only mentioned (1) briefly in a 28-minute video commentary on the making of *Rocky*, entitled, "Video Commentary with Sylvester Stallone" (the "Video Commentary");[5] and (2) in one sentence in an informational

---

[5] Stallone's sole mention of Wepner in the Video Commentary is in the following statement:

*(continue...)*

booklet located inside the sealed DVD (the "Internal Booklet").[6] (*Id.* ¶¶ 5-7, Exs. 1, 2.) In fact, a consumer cannot know from looking at the packaging of the DVD that Wepner's name is mentioned in the Video Commentary or in the Internal Booklet. (*Id.* ¶ 8.) Stallone had no knowledge of or involvement in the creation or distribution of this Internal Booklet. (Stallone Decl., ¶ 10; Thomas Decl., ¶ 7.) Stallone had no control over the distribution, marketing, or sale of the DVD. (Stallone Decl., ¶ 10; Thomas Decl., ¶ 4.)

**2. <u>Stallone's Official Website</u>:** Stallone's official website at www.sylvesterstallone.com was launched in 2001 and includes general information about his life and career including filmography, recent projects, and excerpts from books written by Stallone. (Declaration of Simon Barber ("Barber Decl."), ¶¶ 3-4.; Stallone Decl., ¶ 9.) Wepner's name does not appear on the home page or any other main page on the website. (Barber Decl., ¶ 5.) In fact, a visitor would have to "click" 22 times, *i.e.*, read through 22 web pages in sequence, before

---

*(continued from previous page)*

> And then one night I went to see Muhammad Ali fight Chuck Wepner. And what I saw was pretty extraordinary. I saw a man they call the Bayonne Bleeder who didn't have a chance at all against the greatest fighting machine supposedly that ever lived. … And for one brief moment, this supposed stumblebum turned out to be magnificent in the fact that he lasted and knocked the champion down. I said boy if this isn't a metaphor for life. His entire life crystallized at that moment. He will be remembered for all eternity among the fight fans. He did something extraordinary. I said now that, that is probably what I need as a catalyst for an idea. A man who's going to stand up to life and take one shot and maybe go the distance."

*Rocky* Video Commentary at 3:12-4:25.

[6] The one sentence mention of Wepner's name in the Internal Booklet is: "Sylvester Stallone, a young actor/writer struggling to make his name in Hollywood, was inspired by a 1975 boxing match in which low-ranked fighter Chuck Wepner unexpectedly went a full fifteen rounds against heavyweight champion Muhammad Ali." (Internal Booklet, annexed as Ex. 2 to Thomas Decl., ¶ 7.)

she got to the page containing the single paragraph mentioning that Stallone was inspired by the Wepner fight. (*Id.*) This is because Wepner's name only appears in a subsection of the Biography section of the website where the Rocky Scrapbook is reproduced and the Scrapbook is only viewable one page at a time by clicking the "Next" button. (*Id.*)

**3. Third-Party Reseller Websites:** The websites of several third-party home video resellers, such as buy.com, cduniverse.com and videoflicks.com, that sold the DVD include, among a list of other notable historical facts about *Rocky*, a reference to the fact that the Ali/Wepner fight served as an inspiration for *Rocky*. (Zavin Decl., ¶ 14, Ex. 13, attaching webpage printouts.) Stallone had no knowledge of or involvement with any of these third-party websites, or their decision to make any statements on their website. (Stallone Decl., ¶ 14.)

**4. The ESPN Program:** In or around March 24, 2002, ESPN aired a 30-minute TV show entitled "Keeping Sports Films Real" on its regular sports news program "Outside the Lines" (the "ESPN Program"). (ESPN Program, annexed as Ex. 7 to Zavin Decl., ¶ 8.) The ESPN Program, which aired the night of the 2002 Oscars (for which the boxing film "Ali" was nominated for Best Picture), was about the challenges of making a realistic sports film. (*Id.*) Without Stallone's knowledge or participation, ESPN copied footage from the Video Commentary on the DVD and edited it into segments of the ESPN Program. (Stallone Decl., ¶¶ 12-13.) Credits at the end of the Program indicate that this footage was provided "Courtesy of MGM Home Entertainment." (Zavin Decl., ¶ 8, Ex. 7.) The ESPN Program features an interview with Wepner (and his wife) where he discusses his fight with Ali, and boasts that he is the "real Rocky." (*Id.* ¶¶ 8,9, Ex. 7, 8.)

Aside from Stallone's website, MGM's DVD, the 2002 ESPN sports news program, and third-party DVD reseller websites, Wepner has identified no other uses of his name as the grounds for his claim. (*Id.* ¶ 4, Ex. 3.)

**ARGUMENT**

**I. WEPNER'S NAME WAS MENTIONED FOR INFORMATIONAL PURPOSES ONLY, NOT FOR "PREDOMINANTLY COMMERCIAL" OR "TRADE" PURPOSES.**

Wepner's right of publicity claim must be dismissed because his name was never used by Stallone for any "commercial or trade purpose" – the essential element in a right of publicity claim under New Jersey law. Whether a use is for "predominantly commercial" purposes or is a nonactionable matter of public interest or historical value is a question of law, and can be decided by the court on summary judgment. *See, e.g., Tellado v. Time-Life Books, Inc.,*, 643 F. Supp. 904, 910 (D.N.J. 1986); *Castro v. NYT Television*, 370 N.J. Super. 282, 298, 851 A.2d 88, 98 (Sup. Ct. App. Div. 2004); *see also Joe Dickerson & Assocs., LLC v. Dittmar*, 34 P.3d 995, 1003 (Sup. Ct. Colo. 2001).

**A. New Jersey Law Requires that the Use of Plaintiff's Name be for "Predominantly Commercial or Trade Purposes" to Violate the Right of Publicity.**

As this Court stated in its Opinion, "[m]isappropriation [of the plaintiff's name] occurs when the use of the name 'functions primarily as a means of commercial exploitation,' and not as a means of contributing information or participating in debate as a 'free expression of creative talents which contributes to society's cultural enrichment.'" Op. at 6 (quoting *Estate of Elvis Presley v. Russen*, 513 F. Supp. 1339, 1356 (D.N.J. 1981)). Indeed, the First Amendment staunchly protects the expression of truthful, historical facts.

In determining whether a use is "primarily" or "predominantly" "commercial," and, therefore, actionable, courts must give serious consideration to the defendant's First Amendment interests. The analysis was summarized by the court in *Tellado*:

> The purpose of the portrayal in question must be examined to determine if it predominantly serves a social function valued by the protection of free speech. If the portrayal mainly serves the purpose of contributing information, which is not false or defamatory, to the public debate of political or social issues or of providing the free expression of creative talents which contributes to society's cultural enrichment, then the portrayal generally will be immune from liability. If, however, the portrayal functions primarily as a means of commercial exploitation, then such immunity will not be granted.

*Tellado*, 643 F. Supp. at 911 (citation omitted). *See also Estate of Elvis Presley v. Russen*, 513 F. Supp. 1339, 1356-57 (D.N.J. 1981).

Accordingly, a defendant will only be deemed to have violated the right of publicity if the "use of plaintiff's likeness [or name] was for a ***predominantly commercial purpose***, *i.e.*, if defendant was seeking to capitalize on [plaintiff's] [sic] likeness [or name] for purposes ***other than the dissemination of news or information***." *Tellado,* 643 F. Supp. at 909-10 (emphasis added); *Botts v. The New York Times Co.*, No. 03-1582 (MLC), 2003 WL 23162315, at *7 (D.N.J. Aug. 29, 2003), *aff'd*, 106 Fed. Appx. 109 (3d Cir. 2004) (citation omitted). As this Court correctly noted, "[t]he most common violation of the right of publicity comes in the form of the 'appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product.'" Op. at 6 (quoting *Castro*, 370 N.J. Super. at 297 (quotation omitted)).

Further, it is irrelevant that Stallone may have ultimately indirectly derived a financial benefit from the sale of the DVD. As explained in the Second Restatement of Torts, "the fact that the defendant is engaged in [a] business ... out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of the name or

likeness." RESTATEMENT (SECOND)2d TORTS § 652C, comment d (1977).[7] *See also Carafano v. Metrosplash.com, Inc.*,, 207 F. Supp. 2d 1055, 1074 (C.D. Cal. 2002) ("[t]he fact that [defendant] makes a profit from selling memberships does not transform the speech at issue into commercial speech."), *aff'd*, 339 F.3d 119 (9th Cir. 2003); *Leverton v. Curtis Pub. Co.*, 192 F.2d 974, 977 (3d Cir. 1951) (finding that profit-motive of newspapers and magazines not tantamount to a commercial use).

**B. Wepner's Name was Only Mentioned to Inform the Public of the Creative History of *Rocky* and Was Never Used for Commercial Purposes.**

None of the "uses" of which Wepner complains is legally actionable. Each mention of the Ali/Wepner fight being an inspiration for *Rocky* was made, in the midst of text or spoken commentary, to convey information on the creative history of an iconic film. None of them were advertisements or any other kind of commercial use. This is also apparent from the very placement of these "uses":

(1) There is no mention of Wepner on any of the outside packaging of the DVD, or in any marketing materials for the DVD. (Thomas Decl., ¶ 8.) The mention is in the DVD itself in one of the bonus materials that features an interview with Stallone, and in a single sentence on the Internal Booklet *inside* the sealed DVD case. (*Id.* ¶¶5-7, Exs. 1, 2.) Consumers would have had to purchase the DVD before hearing or seeing any mention of Wepner in the DVD, so there is no way that Wepner's name could have influenced their decision to purchase the DVD. (*Id.* ¶ 8.) Indeed, Wepner offers no evidence that his name has influenced any

---

7 New Jersey courts have adopted the Second Restatement of Torts' formulation of the right of publicity cause of action. *See, e.g., Castro,* 370 N.J. Super. at 295, 851 A.2d at 96; *Botts,* 2003 WL 23162315, at *6; *Bisbee v. John C. Conover Agency, Inc.*, 186 N.J. Super. 335, 343, 452 A.2d 689, 693 (Sup. Ct. 1982).

consumers to purchase the DVD.

(2) The mention of Wepner's name in Stallone's website is literally buried 22 pages into the website. (Barber Decl., ¶ 5.) It is mentioned solely in a paragraph reproduced from the 1977 Rocky Scrapbook discussing Stallone's creation of *Rocky*. (*Id.*) It is not by any stretch of the imagination featured so as to attract buyers to the *Rocky* films or any of Stallone's personal products. (*Id.* ¶ 9.)

(3) The mention of Wepner in the ESPN Program (in which Wepner himself boasts of being the "real life Rocky") appeared in pre-recorded clips from Stallone's interview in the Video Commentary of the DVD and were shown in the context of explaining the challenges of making a realistic sports film. (Zavin Decl., ¶ 8, Ex. 7.) It was shown the night of the Academy Awards in which the film "Ali" was nominated for Best Picture. (*Id.*)

(4) On the third-party websites, such as buy.com, the inspiration of the Ali/Wepner fight is mentioned in a compilation of other interesting facts concerning the background and history of *Rocky*. (*Id.* ¶ 14, Ex. 13.)

None of these uses are actionable under New Jersey law because they are, quite clearly, informational and not for predominantly commercial purposes. *See, e.g., Bisbee,* 186 N.J. Super. at 342-43, 452 A.2d at 692-93; *Seale v. Gramercy Pictures,* 949 F. Supp. 331, 337 (E.D. Pa. 1996) (finding, on summary judgment, that defendant's use of plaintiff's likeness and name in a film about the Black Panthers, in a book about the film, and on the cover of the home video release of the film was not for a commercial purpose). Any other result would violate Stallone's First Amendment rights and have the impermissible chilling effect of prohibiting any person from publicly identifying his or her sources of inspiration or providing any commentary that references historical events, influences, and other noteworthy facts. *See, e.g., Guglielmi v.*

*Spelling-Goldberg Productions*, 603 P.2d 454, 462 (Sup. Ct. Cal. 1979) (Newman, J., concurring) (finding that free expression outweighs the right of publicity, and that doing otherwise would render "the creation of historical novels and other works inspired by actual events and people ... off limits to the fictional author"); *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 638 (9th Cir. 1982) (stating that "[a]ny other conclusion would allow reports and commentaries on the thoughts and conduct of public and prominent persons to be subject to censorship under the guise of preventing the dissipation of the publicity value of a person's identity").

## II. STALLONE IS NOT LIABLE FOR THIRD-PARTY USES OF WEPNER'S NAME

Stallone is also entitled to summary judgment on the independent ground that he had no control over the publication or distribution of the DVD (including its Internal Booklet), the ESPN Program, or the websites of third-party resellers of *Rocky* DVDs. In short, Stallone did not make these complained of "uses" and cannot be liable for them.

To establish a violation of the right of publicity, a plaintiff must demonstrate, among other things, that the ***defendant*** "without permission, ... ***used*** some aspect of [plaintiff's] identity." *Prima v. Darden Restaurants, Inc.*, 78 F. Supp. 2d 337, 349 (D.N.J. 2000) (emphasis added). A person who was not responsible for or did not have any control over the publication or distribution of the allegedly infringing commercial "use" cannot be liable for violation of the right of publicity.

For example, in *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 637 (9th Cir. 1982), the court vacated a judgment against an interviewer who "had no part in the publishing, advertising or marketing of the articles in question." Likewise, in *Stanley v. General Media Communications, Inc.*, 149 F. Supp. 2d 701, 706 (W.D. Ark. 2001) the court dismissed plaintiff's right of publicity claim against the defendant where there was "[n]o evidence suggest[ing] that [defendant] had any participation in the publication of the photo or accompanying text."

Similarly, here, Stallone had no knowledge of or involvement in the creation or distribution of the Internal Booklet included in the DVD. (Stallone Decl., ¶ 10.) Stallone had no control over which portions of his interview would be included in the Video Commentary of the DVD and had no involvement with the distribution, marketing, or sale of the DVD. (*Id.* ¶¶ 10-11.) Stallone had no involvement whatsoever in the ESPN Program. (*Id.* ¶ 12.) Without his knowledge, ESPN duplicated the Stallone interview footage from the DVD and inserted it in the ESPN Program. (*Id.* ¶ 13.) Finally, Stallone has no knowledge of or involvement with any third-party website, including commercial sites that sell *Rocky* DVDs (such as pricegrabber.com. or buy.com). (*Id.* ¶ 14.)

Accordingly, Stallone is entitled to summary judgment dismissing Wepner's publicity claim to the extent it is based on any "use" other than the mention of his name on the official Stallone website (of course, any claim based on the website "use" should be dismissed for all the reasons set forth in Points I, III and IV herein).

## III. WEPNER'S CLAIM MUST BE DISMISSED BECAUSE HE HAS NO EVIDENCE OF DAMAGES.

Stallone is also entitled to summary judgment because Wepner has no evidence of any damages arising from the use of his name in the DVD, on Stallone's official website or elsewhere.

In order to withstand a motion for summary judgment on a right of publicity claim, a plaintiff must submit evidence, in admissible form, that he suffered economic injury as a result of the claimed use. *See, e.g., Estate of Presley v. Russen*, 513 F. Supp. 1339, 1378 (D.N.J. 1981) (noting that for a right of publicity claim, "the plaintiff must demonstrate sufficiently that the defendant's use of the name and likeness . . . has or is likely to result in an ***identifiable economic loss***.") (emphasis added); *Player v. Motiva Enters. LLC*, No. 02-3216 (RBK), 2006 WL 166452, at *9 (D.N.J. Jan. 20, 2006) ("At the summary judgment stage, Plaintiffs must provide actual evidence of injury and cannot simply rely upon 'unsubstantiated allegations.'") (quoting *Trap Rock Indus., Inc. v. Local 825*, 982 F.2d 884, 890 (3d Cir. 1992)); *Norwood*

*Easthill Assoc. v. Norwood Easthill Watch*, 222 N.J. Super. 378, 384, 536 A.2d 1317, 1320 (App. Div. 1988) (holding that plaintiffs in tort action must prove the existence of a material question of fact as to both liability and damages in order to resist a motion for summary judgment).

Wepner has not produced any evidence whatsoever as to how his right of publicity should be valued, whether there was any identifiable economic loss caused by the mention of his name, or the value of any purported benefit to Stallone arising out of the use of his name. The sole "evidence" proffered by Wepner is the testimony of his purported expert witness, Richard Klubeck, a talent agent. In his single-page report, Klubeck asserts that, based on his "experiences as a Producer and a Talent Agent," "motion pictures based on or inspired by true stories or events generally enjoy an enhanced value at the box office." (Zavin Decl., ¶ 7, Ex. 6.)

Even if such testimony were admissible, which it is not,[8] it does not evidence any damages purportedly suffered by Wepner or any value Stallone may have received by virtue of the mention of Wepner's name. Klubeck testified at his deposition that (1) he had no opinion and had not thought about the value of the use of Wepner's name on the DVD; (2) he had no opinion and had not thought about whether Wepner was damaged by any of the uses of Wepner's name of which he was aware; (3) that he had no idea whether anyone not connected with this litigation associated Wepner with *Rocky*; and (4) that he had not thought about or tried to assign a specific value to the use of Wepner's name for solely promotional purposes in the DVD. (Deposition Transcript of Richard Klubeck ("Klubeck Dep. Tr.") at 42:11-13; 46:19-22; 36:24-37:25; 46:23-47:3.) Accordingly, Wepner has no evidence whatsoever as to whether there were

---

[8] Concurrently with this motion, defendant has filed a motion to exclude Wepner's proposed economic value and damages expert, Richard Klubeck, on the grounds that he is unqualified and his proposed testimony is unreliable under Fed. R. Evid. 702. If Mr. Klubeck's testimony is excluded, which it should be, then Wepner's right of publicity claim must be dismissed as a matter of law because he has failed to present any evidence of injury or damages.

in fact any damages, or the value of such damages. There is simply nothing to put in front of a jury with respect to damages in this case.

Without evidence of damages, Wepner's right of publicity claim fails as a matter of law. *See, e.g., Jarvis v. A&M Records*, 827 F. Supp. 282, 299 (D.N.J. 1993) (granting summary judgment on right of publicity claim where plaintiff failed to present testimony, affidavits or other proof of actual harm); *Player*, 2006 WL 166452, at *8-11 (granting summary judgment where plaintiffs provided no evidence of actual damages for tort claims); *Rocci v. MacDonald-Cartier*, 323 N.J. Super. 18, 24-25, 731 A.2d 1205, 1209-10 (Super. Ct. App. Div. 1999) (affirming grant of summary judgment where plaintiff failed to present evidence of actual injury for tort claim), *aff'd*, 165 N.J. 149, 755 A.2d 583 (Sup. Ct. 2000); *Norwood Easthill Assoc.*, 222 N.J. Super at 384, 536 A.2d at 1320 (affirming summary judgment of tort claim on basis that "plaintiff has suffered no injury or damage").

Moreover, by his own admission, for the past 30 years Wepner has perpetuated and benefited from Stallone's acknowledgement by promoting himself as "the Real Rocky."[9] (Wepner Dep. Tr. at 40:4-21; 67:10-21; 74:22-75:9, 39:16-19.) Wepner cannot claim that he was damaged by Stallone's use of his name in connection with *Rocky* when he perpetuates and exploits this association himself. For example, Wepner's own website, at www.wepner.homestead.com, is titled "Chuck 'The Real Rocky' Wepner's Home Page with Muhammad Ali." (Zavin Decl., ¶ 10, Ex. 9.) Wepner's home page bears the title: "A Heavyweight Boxing Legend: Chuck 'The Real Rocky' Wepner's Official Web Site" and

[9] In the article entitled "'Rocky' turns Chuck Wepner into a Winner," dated April 24, 1977, Wepner is referred to as the "real Rocky," and it is reported that Wepner felt "'honored' to be the basis for an Oscar-winning film that draws on his life as well as his bout." The article also reveals that Wepner actually benefited from this publicity and that he was receiving offers for "more personal appearances, more customers and more good-paying fights." Wepner stated that "[m]y future fights will derive from Rocky. Rocky will help me. The movie has already helped me immeasurably. Where my career had quieted down two years after the Ali fight, this picked it up again." (Zavin Decl., ¶ 11, Ex. 10.)

"When a young, impressionable and unknown Philadelphia resident—Sylvester Stallone—saw the Wepner/Ali fight he was instantly inspired to write the blockbuster movie screenplay, Rocky." (emphasis in original). (*Id.*) In addition, on a separate page titled, "Inspirational and Motivational Speaking Engagements, Autographs, Biography, Plus," the words "Stallone" and "Rocky" appear a ***total of twenty-two times***. (*Id.*)

## IV. WEPNER ADMITS HE KNEW THE FACTS UNDERLYING HIS CLAIM IN 1976 AND, THUS, IS TIME-BARRED FROM MAKING ANY CLAIM OR SEEKING ANY DAMAGES BASED ON THE USE OF HIS NAME PRIOR TO 1997.

Stallone is also entitled to summary judgment (1) dismissing Wepner's claim to the extent it is based on any uses of his name prior to the six year period immediately preceding the commencement of this action (*i.e.*, prior to November 1997); and (2) barring him from seeking any damages arising out of any activities occurring prior to that same six year period.

In its Opinion and Order denying Stallone's motion for reconsideration of his motion to dismiss Wepner's claim on statute of limitations grounds, this Court stated that "discovery must be had" in order to resolve the "factually specific analysis" of exactly when the misappropriation claims accrued. (Reconsideration Opinion, annexed as Ex. 14 to Zavin Decl., ¶ 15 at 3.) Discovery is now complete and has confirmed that Wepner's claim accrued no later than 1976 when, as he admits, he knew of Stallone's public statements mentioning the Ali/Wepner fight as an inspiration for *Rocky*. Accordingly, at most, Wepner may only seek damages for alleged new "misappropriations" of his name occurring within the six year limitations period.

The six-year statute of limitations set forth in N.J.S.A. § 2A:14-1 applies to right of publicity claims in New Jersey. *Rumbauskas v. Cantor*, 138 N.J. 173, 183, 649 A.2d 853, 858 (Sup. Ct. 1994), *aff'd*, 53 Fed. Appx. 635 (3d Cir. 2002); *Rolax v. Whitman*, 175 F. Supp. 2d 720, 726 (D.N.J. 2001). Wepner's claim accrued when he "kn[e]w, or after the exercise of reasonable diligence should [have known]" of his injury. *Rolax*, 175 F. Supp. 2d 720, 727 (D.N.J. 2001) (citing *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1162 (3d Cir. 1979)).

Wepner admits that he knew of Stallone's public statements mentioning his name and allegedly adding "tremendous appeal to the Rocky franchise" since 1976, the year *Rocky* was released. (Wepner Dep. Tr. at 11:21-12:23; 61:7-21.) Wepner also testified that he saw the statement about him being an inspiration for *Rocky* in "[d]ifferent magazines," "papers," "videos," and "on television." (*Id.* at 27:8-14.)

Accordingly, Wepner has no basis for any claims or for seeking any damages for any uses of his name prior to six years before he commenced this action. Thus, for example, Wepner's claim based upon Stallone's website is entirely time-barred because the "use" is simply an online quote from the Rocky Scrapbook that was first published in 1977. (Barber Decl., ¶ 5.) This is true regardless of whether the "continuing tort" theory, previously asserted by Wepner, applies here or not.[10] While the continuing tort theory may resurrect an otherwise time-barred claim, it does not permit recovery of damages incurred outside the six year statute of limitations period prior to the commencement of the action. *See, e.g., Interfaith Community Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 858 (D.N.J. 2003) (applying continuing tort doctrine to cross-claims, but limiting recovery of damages to limitation period immediately preceding filing of claims), *aff'd*, 399 F.3d 248 (3d Cir. 2005); *Russo Farms, Inc.*, 144 N.J. at 102, 675 A.2d at 1086 (noting treatise authority that continuing tort damages are confined to damages accruing within the statutory period immediately prior to suit).

---

[10] New Jersey courts addressing the continuing tort doctrine in different contexts make clear that it cannot apply to right of publicity claims. Generally, the continuing tort theory is only applied to tort claims, such as nuisance or employment discrimination claims, "'when the acts or conduct are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable ***because of its continuous, cumulative, synergistic nature***.'" *Wilson v. Wal-Mart Stores*, 158 N.J. 263, 273, 729 A.2d 1006, 1011 (Sup. Ct. 1999) (citation omitted; emphasis added); *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 144 N.J. 84, 102, 675 A.2d 1077, 1086 (1996); *Casini v. Graustein (In re Casini)*, 307 B.R. 800, 814 (Bankr. D.N.J. 2004) ("A continuous tort argument is more appropriate for claims that are inherently and cumulatively wrongful, rather than discrete wrongful acts.").

## CONCLUSION

For the foregoing reasons, Stallone respectfully requests that the Court grant his motion for summary judgment in all respects.

Dated: June 30, 2006

SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC

/s/ David J. D'Aloia
David J. D'Aloia
Phoebe S. Sorial
One Gateway Center, 13th Floor
Newark, New Jersey 07102-5311
(973) 622-3333 (telephone)
(973) 622-3349 (fax)

Jonathan Zavin
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154

Martin D. Singer
Michael D. Holtz
LAVELY & SINGER, PC
2049 Century Park East, Suite 2400
Los Angeles, CA 90067

Stephen F. Huff
Jacob B. Radcliff
PRYOR CASHMAN SHERMAN & FLYNN, LLP
410 Park Avenue
New York, New York 10022

**ATTORNEYS FOR DEFENDANT SYLVESTER STALLONE**